# Exhibit B

Case 1:21-cv-04240-GHW-BCM    Document 1-2    Filed 05/12/21    Page 2 of 17

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

| | |
|---|---|
| **JAMES O'KEEFE III,** | Index No. _____ |
| *Plaintiff,* | |
| *v.* | |
| **TWITTER, INC.,** | **COMPLAINT** |
| *Defendant.* | |

Plaintiff James O'Keefe III, by and through his undersigned attorneys, brings the following Complaint against Defendant Twitter, Inc. ("Twitter") and alleges as follows:

### SUMMARY OF THE ACTION

1.     This defamation action arises from Twitter's false and defamatory April 15, 2021, statement concerning Twitter's decision to ban Plaintiff James O'Keefe, an investigative journalist followed by over 926,000 Twitter users as of the time he was banned.

2.     Twitter's false and defamatory claim was that it removed Mr. O'Keefe because he "operated fake accounts," as reported by journalists exemplified in *Figure 1* below.



*Figure 1*



3.     Mr. O'Keefe is a journalist whose reputation depends on his ethical and transparent conduct and his production of reliable and accurate news reporting.

4.     Twitter's published claim that Mr. O'Keefe "operat[ed] fake accounts" is patently and demonstrably false.

5.     Moreover, as detailed below, as the owner and operator of its own platform, Twitter was in a unique position to know that this claim was false.

6.     Alternatively, given the extent of its knowledge and information, Twitter acted with reckless disregard for the falsity of this claim when it published it.

7.     Twitter's false claim that Mr. O'Keefe used "fake accounts" on Twitter has caused Mr. O'Keefe damage and, unless retracted, will continue to cause him damage, as set forth in detail below.

### PARTIES

8.     Plaintiff James O'Keefe is a natural person residing in New York State. He is the president, chief executive, and board chairmain of Project Veritas, a non-profit, nonstock Virginia corporation doing business primarily in Mamaroneck, New York, in Westchester County.

9.     Defendant Twitter is a privately-owned Delaware corporation that operates the social media publication Twitter.com, having a place of business at 245 West 17th Street in Manhattan.

### ALLEGATIONS

**Project Veritas and Project Veritas Action**

10.     Mr. O'Keefe founded Project Veritas, a non-profit 501(c)(3), in 2011, and Project Veritas Action, a non-profit 501(c)(4) separate legal entity, to investigate and expose corruption,



2

Case 1:21-cv-04240-GHW-BCM    Document 1-2    Filed 05/12/21    Page 4 of 17

dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions.

11.     The goal of Project Veritas and Project Veritas Action is enhancing ethical conduct and institutional transparency in American society.

12.     Project Veritas and Project Veritas Action journalists often work undercover and enlist the help of whistleblowing insiders to identify and expose institutional corruption through the use of audio or video recordings to corroborate what they learn concerning the subjects of their investigations.

13.     Project Veritas and Project Veritas Action often investigate high profile institutions and persons that traditional media outlets do not scrutinize.

14.     Since founding Project Veritas and Project Veritas Action, Mr. O'Keefe has successfully exposed bias and politically motivated reporting by national news outlets.

15.     Because of this, those who benefit from the news media's status quo reporting or share traditional news outlets' ideological orientation have targeted Project Veritas, Project Veritas Action, and Mr. O'Keefe by, among other things, attempting to silence them.

**Twitter "Actions" Against Project Veritas and Plaintiff's Accounts**

16.     Project Veritas and Project Veritas Action operated corporate Twitter accounts until February 2021.  These were the official accounts of Project Veritas and Project Veritas Action, by which their respective official communications would be published on Twitter.

17.     On February 11, 2021, Project Veritas published a video showing Project Veritas reporters seeking to interview Facebook vice president Guy Rosen outside a residence.  This video was then published on Project Veritas' Twitter account.



3

18.    The same day, Twitter suspended the official Project Veritas account claiming the Guy Rosen video/tweet violated Twitter's policy prohibiting the publication of "private information."  Twitter offered no explanation of why this video/tweet supposedly violated this policy.  The video depicted nothing more than the reporters asking Mr. Rosen questions which he refused to answer.  No personal information of Mr. Rosen (or anyone else for that matter) was disclosed.  Though the video briefly showed the house number of the residence in the video, it did not show the street, city, or even state in which the house was located.  This is common journalistic practice.  So much so, in fact, Twitter does not typically deem such conduct a prohibited publication of private information and examples of other news organizations and Twitter users that have not been sanctioned, much less banned without warning, for similar actions or even actual publication of actual private information, abound.

19.    Indeed, CNN had done the same thing on a video tweet with over 2.2 million views in which CNN reporter Drew Griffin confronted a private individual, accused her of spreading Russian disinformation, and exposed her private residential address for the world to see, as shown on *Figure 2*, right:



*Figure 2*



Case 1:21-cv-04240-GHW-BCM    Document 1-2    Filed 05/12/21    Page 6 of 17

20.    CNN and and its tweet showing the address of this private individual remains active on Twitter to this day. *See*    @CNN, TWITTER.COM (February 20, 2018), https://twitter.com/cnn/status/966134015337140229?s=21.

21.    Initially, Twitter claimed Project Veritas' suspension was just temporary – giving Project Veritas the option to delete the Guy Rosen video/tweet, or appeal Twitter's decision that the tweet violated Twitter's rules.  When questioned by CNN, however, Twitter changed its story and made the suspension permanent, again claiming the Guy Rosen video/tweet violated "the platform's policies prohibiting sharing — or threats of sharing — other people's private information without consent." Brian Fung, *Twitter permanently bans Project Veritas account*, CNN.COM (February 11, 2021),    https://www.cnn.com/2021/02/11/tech/twitter-project-veritas/index.html.

22.    Nothing in the Project Veritas tweets concerning this encounter disseminated private, i.e., confidential information.  Despite this, Twitter refused to speak to Project Veritas about the suspension or the reason for it.

23.    Only days later, Twitter then permanently suspended Project Veritas Action's Twitter account without warning, claiming the account was created to improperly attempt to get around the Project Veritas' permanent suspension. Project Veritas Action is a separate legal entity from Project Veritas, and maintained a separate Twitter account for years to publish its own content.  Once again, Twitter refused to speak to Project Veritas about the suspension or the reason or it.

24.    Although the Project Veritas and Project Veritas Action's Twitter accounts were suspended permanently in February of this year, Mr. O'Keefe's personal Twitter account remained active until April 15, 2021.



5

Case 1:21-cv-04240-GHW-BCM    Document 1-2    Filed 05/12/21    Page 7 of 17

**<u>Mr. O'Keefe Exposes CNN</u>**

25.    At no time prior to Mr. O'Keefe's permanent Twitter suspension on April 15, 2021, was he warned, advised or otherwise given reason to know that Twitter believed he was using fake accounts.

26.    Beginning on April 13, 2021, Project Veritas published, on its own websit, as well as all major social media sites, a series of undercover reporting videos and reports concerning the political reporting of CNN.

27.    In these videos, a CNN technical director appears to admit that CNN used misleading reporting techniques and purposefully manipulated its reporting to harm the political prospects of former President Donald Trump in the 2020 presidential campaign.  The CNN employee called CNN's own coverage "propaganda," claiming "fear sells" and noting CNN's coverage follows the adage "if it bleeds it leads."

28.    Within hours of being published, the videos were trending #2 on Twitter in the United States, with hundreds of thousands of people tweeting about them.  As of the filing of this complaint, the videos have already been seen and shared by millions around the globe, and have been covered by major media around the globe including *Newsweek*, Politico, Business Insider, Yahoo News, *Daily Mail*, FoxNews, and *Forbes*, among others.

29.    On April 15, 2021, Mr. O'Keefe tweeted out the third of Project Veritas's video releases about CNN on his personal Twitter account, as well as on all major social media sites.

30.    The very same day, Mr. O'Keefe's personal Twitter account was abruptly and permanently suspended, without providing Mr. O'Keefe warning or any prior notice.



6

**Twitter's False and Defamatory "Fake Accounts" Claim**

31.     After suspending Mr. O'Keefe's personal Twitter account on April 15, Twitter, through an unnamed spokesperson, disseminated to media outlets the provably false statement that Mr. O'Keefe was "operating fake [Twitter] accounts." *See* e.g., Katie Robertson, "Twitter bans the account of James O'Keefe, the founder of Project Veritas," THE NEW YORK TIMES (April 15, 2021) https://www.nytimes.com/2021/04/15/business/twitter-james-okeefe.html.

32.     Notably, Twitter made these public statements to third parties more than half an hour before communicating this information to Mr. O'Keefe.

33.     Other journalists republished Twitter's false statements, for example, as shown on Figure 1 above, referring to a "Twitter spox," meaning "spokesman."

34.     The reason Twitter never warned Mr. O'Keefe or otherwise took action relating to his supposed operation of "fake accounts," as alleged above, prior to his permanent suspension is that Mr. O'Keefe does not own, control, use, or operate fake Twitter accounts.

35.     Twitter's claim that Mr. O'Keefe "misle[]d others on Twitter by operating fake accounts" is false and defamatory.

36.     As is relevant to Twitter's false claim, Mr. O'Keefe only ever used his personal account to tweet links to the Project Veritas reports about CNN, as did many thousands of other Twitter users.

**Twitter's "Fake Accounts" Policy and Enforcement**

37.     The false accusation that Mr. O'Keefe operated "fake accounts" is particularly damaging for Mr. O'Keefe because Mr. O'Keefe is a journalist. As such, his reputation for transparency and accurate reporting is fundamental to his profession.



7

Case 1:21-cv-04240-GHW-BCM   Document 1-2   Filed 05/12/21   Page 9 of 17

38.     By accusing Mr. O'Keefe of "operating fake accounts," Twitter was directly attacking Mr. O'Keefe's fitness for his profession by accusing him of "misleading others" and by effectively running a disinformation outlet akin to the much-discussed "Russian interference"/disinformation bots that plagued the 2016 election and which inspired some political operatives to engage in similar tactics in 2017. Scott Shane and Alan Blinder, *Secret Experiment in Alabama Senate Race Imitated Russian Tactics*, THE NEW YORK TIMES (December 19, 2018), https://www.nytimes.com/2018/12/19/us/alabama-senate-roy-jones-russia.html.

39.     Indeed, Twitter's entire "fake accounts" policy, which it accused Mr. O'Keefe of violating by stating that he "operat[ed] fake accounts," stems from the Russian disinformation campaign.

40.     Thus, by claiming Mr. O'Keefe operated "fake accounts," Twitter was saying Mr. O'Keefe could not be trusted as a journalist because he was "misleading others" via disinformation in the manner the Russian government is widely accused of doing to interfere in the U.S. political process.

41.     Indeed, in response to allegations of Russian interference in the 2016 elections, Twitter announced January 29, 2018, that it was taking a number of active steps to "make progress against poetential manipulation of [Twitter's] platform" as a part of its commitment "to providing a platform that fosters healthy civic discourse and democratic debate." "Update on Twitter's review of the 2016 election," TWITTER BLOG (January 19, 2018), https://blog.twitter.com/official/en_us/topics/company/2018/2016-election-update.html .

42.     Twitter executives Yoel Roth and Del Harvey followed this announcement with a June 26, 2018, blog post which stated as follows :

>      [I]f we [had] put an account into a read-only state (where the account can't engage
>      with others or Tweet) because our systems have detected it behaving suspiciously,



8

we now remove it from follower figures and engagement counts until it passes a challenge, like confirming a phone number. We also display a warning on read-only accounts and prevent new accounts from following them to help prevent inadvertent exposure to potentially malicious content. If the account passes the challenge, its footprint will be restored (though it may take a few hours). We are working to make these protections more transparent to anyone who may try to interact with an account in this read-only state.

As a result of these improvements, some people may notice their own account metrics change more regularly. But we think this is an important shift in how we display Tweet and account information to ensure that malicious actors aren't able to artificially boost an account's credibility permanently by inflating metrics like the number of followers.

43.     The post went on to outline other specific measures Twitter was taking to root out

fake accounts:

2) Improving our sign-up process

To make it harder to register spam accounts, we're also going to require new accounts to confirm either an email address or phone number when they sign up to Twitter. This is an important change to defend against people who try to take advantage of our openness. We will be working closely with our Trust and Safety Council and other expert NGOs to ensure this change does not hurt someone in a high-risk environment where anonymity is important. Look for this to roll out later this year.

3) Auditing existing accounts for signs of automated sign-up

We're also conducting an audit to secure a number of legacy systems used to create accounts. Our goal is to ensure that every account created on Twitter has passed some simple, automatic security checks designed to prevent automated signups. The new protections we've developed as a result of this audit have already helped us prevent more than 50,000 spammy sign-ups per day.

As part of this audit, we're imminently taking action to challenge a large number of suspected spam accounts that we caught as part of an investigation into misuse of an old part of the sign-up flow.

*Id.*

44.     Indeed, on July 9, 2018, the *Washington Post* reported:

Twitter has sharply escalated its battle against fake and suspicious accounts, suspending more than 1 million a day in recent months, a major shift to lessen the flow of disinformation on the platform, according to data obtained by The Washington Post. . . .

Del Harvey, Twitter's vice president for trust and safety, said in an interview that the company is changing the calculus between promoting public discourse and



9

preserving safety. She added that Twitter only recently was able to dedicate the resources and develop the technical capabilities to target malicious behavior in this way. . . .

The decision to forcefully target suspicious accounts followed a pitched battle within Twitter last year over whether to implement new detection tools. One previously undisclosed effort called "Operation Megaphone" involved quietly buying fake accounts and seeking to detect connections among them, said two people familiar with internal deliberations. They spoke on the condition of anonymity to share details of private conversations.

Rather than merely assessing the content of individual tweets, the company began studying thousands of behavioral signals, such as whether users tweet at large numbers of accounts they don't follow, how often they are blocked by people they interact with, whether they have created many accounts from a single IP address, or whether they follow other accounts that are tagged as spam or bots.

Sometimes the company suspends the accounts. But Twitter also limits the reach of certain tweets by placing them lower in the stream of messages, sometimes referred to as "shadow banning," because the user may not know they are being demoted.

Harvey said the effort built on the technical expertise of an artificial intelligence start-up called Magic Pony that the company acquired in 2016. The acquisition "laid the groundwork that allowed us to get more aggressive," Harvey said. "Before that, we had this blunt hammer of your account is suspended, or it wasn't."

Craig Timberg and Elizabeth Dwoskin, "Twitter is sweeping out fake accounts like never before, putting user growth at risk," WASHINGTON POST, (July 6, 2018) https://www.washingtonpost.com/technology/2018/07/06/twitter-is-sweeping-out-fake-accounts-like-never-before-putting-user-growth-risk/.

45.     Twitter's efforts to monitor and analyze accounts for indications that they were "fake" continued and intensified, resulting in increasing levels of sophistication and success.

46.     After this article's publication, Twitter's efforts to monitor and analyze accounts for indications that they were "fake" continued and intensified, resulting in increasing levels of sophistication and success. Thus, on February 3, 2020, Twitter announced the following update to its privacy policy:

On December 24, 2019 we became aware that someone was using a large network of fake accounts to exploit our API and match usernames to phone numbers. We immediately suspended these accounts and are disclosing the details of our



10

Case 1:21-cv-04240-GHW-BCM   Document 1-2   Filed 05/12/21   Page 12 of 17

investigation to you today because we believe it's important that you are aware of what happened, and how we fixed it.

During our investigation, we discovered additional accounts that we believe may have been exploiting this same API endpoint beyond its intended use case. While we identified accounts located in a wide range of countries engaging in these behaviors, we observed a particularly high volume of requests coming from individual IP addresses located within Iran, Israel, and Malaysia. It is possible that some of these IP addresses may have ties to state-sponsored actors. We are disclosing this out of an abundance of caution and as a matter of principle.

After our investigation, we immediately made a number of changes to this endpoint so that it could no longer return specific account names in response to queries. Additionally, we suspended any account we believe to have been exploiting this endpoint.

Protecting the privacy and safety of the people who use Twitter is our number one priority and we remain focused on stopping abuse of Twitter's API as quickly as possible.

"An Incident Impacting your Account Identity," TWITTER PRIVACY CENTER (February 3, 2020),

https://privacy.twitter.com/en/blog/2020/an-incident-impacting-your-account-identity.

47.    The above-quoted web page, in turn, links to the "Twitter Transparancy Report," which offers extensive information and data regarding the measures taken by Twitter to ensure the integrity of its platform. "Twitter Transparency Report," TWITTER TRANSPARENCY CENTER (January 11, 2021), https://transparency.twitter.com/.

48.    On information and belief, "impersonation" and "fake accounts" are the same thing.

**Twitter Knew Its Claim Was False and/or Recklessly Disregarded the Truth**

49.    As detailed above, Twitter controls and operates its own platform and necessarily has the means and ability to confirm if an individual is operating multiple accounts under aliases and to authenticate the identities of those who open accounts, and as set forth in the publications quoted Twitter does so on a regular basis.



11

Case 1:21-cv-04240-GHW-BCM   Document 1-2   Filed 05/12/21   Page 13 of 17

50.     Such monitoring and examination, moreover, are, on information and belief, more common when Twitter's analysis points to a connection between accounts that have very large numbers of followers, such as that of Mr. O'Keefe, which had over 900,000 followers.

51.     Twitter, on information and belief, did in fact perform such monitoring and examination with respect to the account of Mr. O'Keefe.

52.     Given the extent of such monitoring and the prominence of Mr. O'Keefe's account, the odds would appear infinitesimal that Twitter could have concluded, albeit erroneously and negligently, that Mr. O'Keefe was operating fake accounts and formulated and disseminated a statement explaining its supposed reason for banning Mr. O'Keefe on the very same day, and within hours, of his use of that account to publicize embarrassing disclosures concerning CNN.

53.     In fact, Twitter, necessarily knew that its claim that Mr. O'Keefe operated fake accounts was false, or had information before it which would cause a reasonable person to harbor doubts as to truthfulness of the allegation that Mr. O'Keefe maintained fake accounts, when it made these claims on April 15, 2021.

54.     On information and belief, Twitter made such claims with knowledge of their falsity in order to distract and detract from Project Veritas's CNN release of the same day. Twitter made this clear by its actions after it suspended Mr. O'Keefe.

55.     By the evening of April 15th – the day of Mr. O'Keefe's suspension – Twitter users searching for the term "Project Veritas" on Twitter were directed, under the "People" results tab, to the Twitter feed of CNN – the very news organization Project Veritas had implicated for political bias in its most recent expose. A true and correct reproduction of the Twitter results generated by such a search query, as of the date of this Complaint, is set out below as *Figure 3*:



12

Case 1:21-cv-04240-GHW-BCM    Document 1-2    Filed 05/12/21    Page 14 of 17



*Figure 3*

56.     This manipulation by Twitter of its own search results supports the inference that Twitter knowingly or recklessly made false statements about its reason for banning Mr. O'Keefe as a pretext to mislead the public regarding Twitter's true purpose, which was silencing Mr. O'Keefe's reporting and, on information and belief, causing harm to his reputation and credibility as an investigative journalist.

## CLAIM FOR RELIEF
### Defamation

57.     Mr. O'Keefe hereby incorporates and realleges the foregoing allegations of the Complaint as if fully set forth herein.

58.     On April 15, 2021, Twitter, through its spokesperson, published false statements to multiple third parties accusing Mr. O'Keefe of "operating fake [Twitter] accounts."

59.     Twitter's statements are provably false because Mr. O'Keefe has never operated "fake" Twitter accounts.

60.     Rather, Mr. O'Keefe has published on Twitter only from his personal account since the time the official Project Veritas and Project Veritas Action accounts were suspended.



13

61.     Even before the suspension of the separate private Project Veritas and Project Veritas Action accounts for the legally separated entities, though Mr. O'Keefe would from time to time craft, review, and/or approve tweets from the Project Veritas and/or Project Veritas Action accounts, Mr. O'Keefe typically only tweeted from his personal account.

62.     None of these accounts were "fake."

63.     Twitter's statements were and continue to be published without adequate investigation or inquiry first being made to determine their truthfulness.

64.     Twitter acted with intent to injure Mr. O'Keefe's good name and reputation.

65.     Twitter acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

66.     Twitter's statements wrongfully and unlawfully place Mr. O'Keefe in a false, misleading, and damaging light in the eyes of the public and of potential employers.

67.     Twitter's false statements subject Mr. O'Keefe to hatred, contempt, and ridicule, and tend to diminish the esteem, respect, goodwill, or confidence in which Mr. O'Keefe is held.

68.     Twitter's false statements also excite adverse, derogatory, or unpleasant feelings or opinions against Mr. O'Keefe.

69.     Twitter's statements further falsely ascribe to Mr. O'Keefe characteristics or a condition incompatible with the proper conduct of his lawful business, trade, and profession as an investigative journalist.

70.     Accusing Mr. O'Keefe of misleading his readership by using fake or fraudulent Twitter accounts is extremely damaging to his reputation and imputes general disqualification to do his job as an investigative journalist by lowering the credibility of his reporting and general reputation for veracity.



14

71.     All the damage suffered by Mr. O'Keefe was completely foreseeable on Twitter's part, and, upon information and belief, was intended by them or came about as a result of their malicious, reckless, and negligent conduct.

### DEMAND FOR JURY TRIAL

Plaintiff James O' Keefe III demands trial by jury on all claims in this action of all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Mr. O'Keefe respectfully prays for judgment as follows:

A.     For judgment in favor of Plaintiff against Defendant;

B.     For general, special, and compensatory damages and according to proof;

C.     For punitive and exemplary damages according to proof;

D.     For a permanent injunction enjoining Twitter, its officers, agents, servants, employees, and all other persons acting in concert or participation with Twitter from further dissemining the false, misleading, and defamatory representations of fact concerning Mr. O'Keefe discussed above, and requiring Twitter to remove such statements in all forums in which they are posted;

E.     That this Court award Mr. O'Keefe all reasonable costs; and

F.     That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

Date:   April 19, 2021

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FERRARA, WOLF & CARONE, LLP

By: _____*/s/ Justin T. Kelton*_____
        Justin T. Kelton
        NY Bar Number 4737052



15

jkelton@abramslaw.com
81 Main Street, Suite 306
White Plains, NY 10601
Tel.: (914) 607-7010

DHILLON LAW GROUP INC.
Harmeet K. Dhillon
NY Bar Number 2288835
harmeet@dhillonlaw.com
Ronald D. Coleman
NY Bar Number 2288835
rcoleman@dhillonlaw.com
Karin M. Sweigart
(*Pro Hac Vice* pending)
ksweigart@dhillonlaw.com
256 5th Ave., 4th Floor
New York, NY 10001
Tel.: 347-996-4840

*Attorneys for Plaintiff*
*James O'Keefe III*



16